## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA

STEVEN ANTHONY COZZIE,

   Petitioner,

v.            Case No. _____

JULIE L. JONES, SECRETARY,   **CAPITAL CASE**
FLORIDA DEPARTMENT OF
CORRECTIONS,

   Respondent.

_____/

### MOTION FOR APPOINTMENT OF COUNSEL

Petitioner, a Florida prisoner sentenced to death, respectfully moves for the appointment of the Capital Habeas Unit ("CHU") of the Office of the Federal Public Defender for the Northern District of Florida as his counsel under 18 U.S.C. § 3599. As explained below, appointing the Northern District CHU as § 3599 counsel at this juncture in this Northern District case is consistent with Defender Services Committee guidelines and is appropriate under the specific circumstances presented.

A motion for *in forma pauperis* status accompanies this motion. Petitioner is an indigent death row inmate.

Filed JUL 31 '17 USDC FLN 4PM 0316

The Florida Attorney General, as counsel for Respondent, has authorized the CHU to represent that Respondent does not object to the granting of this motion.[1]

## I.    Background

In 2013, Petitioner was convicted of murder in the Circuit Court of the First Judicial Circuit, in and for Walton County, Florida.  In May 2017, the Florida Supreme Court affirmed Petitioner's conviction and sentence on direct appeal. *Cozzie v. State*, No. SC13-2393, 2017 WL 1954976, at *14 (Fla. May 11, 2017). Petitioner's motion for rehearing is pending in the Florida Supreme Court.  As explained in more detail below, Petitioner's claims on direct appeal involved, among other things, complex issues relating to his mental health, which are also likely to play a central role in his federal habeas proceedings.

Counsel has not yet been appointed for Petitioner's state post-conviction or federal habeas corpus proceedings.

## II.    Petitioner is indigent and qualifies for appointed counsel under § 3599

Section 3599(a)(2) provides that death-sentenced state prisoners who are or become "financially unable to obtain adequate representation" are entitled to appointment of counsel to represent them in seeking a federal writ of habeas corpus

---

[1] While the CHU's position is that Respondent's counsel lacks standing on the question of appointment of counsel under §3599, the undersigned contacts Respondent's counsel as a professional courtesy with respect to the CHU's appointment motions.

pursuant to 28 U.S.C. § 2254.  Petitioner, a death-sentenced Florida prisoner, is indigent.  He was previously granted indigent status and appointed public defender counsel at trial and appeal by the state courts.  Petitioner qualifies for the appointment of § 3599 counsel to represent him in federal habeas proceedings.

### III.    The CHU is available and qualified to take the appointment

The CHU is available and qualified to take this Northern District appointment under § 3599.  The CHU was established by the Administrative Office of the United States Courts, in concurrence with the Chief Judge of the Court of Appeals for the Eleventh Circuit and the Chief Judge of the Northern District, to help ensure that death-sentenced Florida prisoners receive competent and meaningful federal habeas representation.  As the sole institutional federal capital defender in Florida, the CHU has specialized expertise in capital habeas litigation.  The CHU represents death-sentenced individuals in federal habeas proceedings, and also advises, assists, and trains counsel in capital cases.  The CHU has a staff of attorneys and investigators who are available and qualified to provide effective defense services to Petitioner.

### IV.    Defender Services Committee policy, the specific circumstances of this case, and the interests of judicial efficiency support appointing the CHU as Petitioner's § 3599 counsel now, rather than during or after state post-conviction proceedings

#### A.    DSC policy encourages early federal habeas appointments

The policy of the Judicial Conference Committee on Defender Services ("DSC") encourages early federal habeas appointments.  DSC policy states that

3

"[f]ederal courts should be encouraged to appoint counsel to represent state death-sentenced prisoners in federal capital habeas corpus cases at the earliest possible time permissible by law; preferably, no later than the conclusion of the state direct appeal." Goal 1, Strategy 12, Timely Appointment of Federal Habeas Counsel, Judicial Conference Committee on Defender Services (Approved June 2008) ("DSC Policy") (attached) at 3. For purposes of the DSC guidance, conclusion of the state direct appeal "means affirmance of the conviction and sentence by the highest state court of authority hearing the case, regardless of whether a petition for certiorari will be filed in the United States Supreme Court." *Id.*, Comment to Strategy 12.

DSC policy recognizes that seeking early federal appointments should be encouraged because "[t]his strategy implicitly places a duty upon counsel who anticipate representing state death-sentenced prisoners in such cases to seek federal appointments and appropriate litigation resources at the earliest time permissible by law." *Id.* This is crucial in capital habeas litigation because, as the DSC emphasizes, federal counsel need adequate time to investigate, research, and prepare meaningful § 2254 petitions. *Id.* Indeed, prior to even beginning work on the petition, federal counsel must read the trial record, establish a relationship with the client, assemble a team that includes expert forensic witnesses, investigators and mitigation experts, "and make preliminary evaluations regarding such matters as client competency, mental retardation, and mental health issues," as well as comply with the ABA

Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. *Id.* (emphasis added). Extra-record claims cannot be raised on direct appeal, but must be fully investigated and developed for habeas petitions. *Id.*

As the DSC relates, experience has shown that the one-year statute of limitations imposed by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), "is barely sufficient time to file a federal capital habeas corpus petition even when the petitioner is represented by experienced, institutionally-funded, full-time federal defender staff well versed in capital habeas litigation." *Id.* Delaying appointment of § 3599 counsel while the state post-conviction litigation proceeds usually shortens this already constricted timeline. *Id.* Experience has also shown that state post-conviction counsel "often expend nearly all of the federal limitations period before filing a state post-conviction pleading" that has tolling effect. *Id.* at 4.

DSC policy recognizes the Supreme Court's caution that "[a]n attorney's assistance prior to the filing of a capital defendant's habeas corpus petition is crucial, because 'the complexity of our jurisprudence in this area . . . makes it unlikely that capital defendants will be able to file successful petitions for collateral relief without the assistance of persons learned in the law." *McFarland v. Scott*, 512 U.S. 849, 855-56 (1994). Based on that reasoning, the Supreme Court held that a "post conviction proceeding" within the meaning of § 3599 "is commenced by the filing of a death row defendant's motion requesting the appointment of counsel for his

5

federal habeas corpus proceeding." *Id.* at 856-57. In sum, DSC policy emphasizes that it is critical that counsel be appointed as early as possible in order to fulfill the Supreme Court's mandate of meaningful assistance. DSC Policy (Comment) at 4.

**B.  In light of DSC policy, appointing the CHU as Petitioner's federal counsel is appropriate at this juncture**

In light of the DSC policy described above, appointing the CHU as Petitioner's §3599 counsel is appropriate at this juncture. Petitioner's conviction and death sentence were affirmed by the Florida Supreme Court on direct appeal on May 11, 2017. *Cozzie*, 2017 WL 1954976, at *14. DSC policy provides that Petitioner should be appointed § 3599 counsel "at the earliest possible time permissibly by law," and *"no later than the conclusion of the state direct appeal."* DSC Policy at 3 (emphasis added). Appointing the CHU as Petitioner's § 3599 counsel will allow the CHU adequate time to investigate, research, and prepare the groundwork for a meaningful federal habeas presentation at the conclusion of the state post-conviction process. An appointment will allow the CHU to familiarize itself with the trial record, establish a relationship with Petitioner, assemble a team that includes forensic experts, investigators and mitigation experts, and make informed evaluations regarding issues such as Petitioner's competency, intellectual abilities, and mental health issues. *See id.* As described in more detail below, this is especially important in this case, as the CHU will likely need to investigate complex mental health questions.

6

**C.    Appointing the CHU as Petitioner's federal counsel now is
particularly important given the specific circumstances of this case**

In addition to comporting with DSC policy, appointing the CHU as
Petitioner's federal counsel now is particularly important in light of the specific
circumstances of this case, which involves complex issues relating to Petitioner's
mental health.  These issues played a central role in Petitioner's direct appeal
litigation and are likely to also be critical in his federal habeas litigation.  It is
therefore important that the CHU receive a federal appointment as soon as
practicable, so that it will have adequate time to familiarize itself with the record,
develop a relationship of trust with Petitioner, investigate these mental health claims,
and retain experts to perform evaluations.  *See* DSC Policy at 3 (federal counsel
should be appointed as early as practicable in order to allow adequate time to "make
preliminary evaluations regarding such matters as client competency, mental
retardation, and mental health issues.").

The Florida Supreme Court's opinion affirming Petitioner's conviction and
sentence on direct appeal provides a window into the complexity of Petitioner's
federal habeas litigation.  The state court's opinion reflects that, during the penalty
phase of Petitioner's trial, his defense counsel presented the testimony of two mental
health experts, Dr. Steven Gold, a forensic psychologist, and Dr. Stephen Zieman, a
clinical psychologist with a specialty in clinical neuropsychology. *Cozzie*, 2017 WL
1954976, at *3 (Fla. 2017).  Dr. Gold testified that Petitioner's childhood included,

among other things, physical abuse, sexual abuse, verbal and emotional abuse, emotional and physical neglect, parental separation, homelessness, domestic violence, and interaction with people who may have been mentally ill and who used drugs and alcohol. *Id.* Dr. Gold further testified that Petitioner heard voices and experienced command hallucinations, has PTSD as a result of physical abuse and being raped by his stepbrother, experienced sleep disorders, dissociative reactions, and blackouts, was possibly psychotic, and was probably born with deficits as a result of oxygen deprivation caused by the umbilical cord being wrapped around his neck. *Id.* The other expect, Dr. Zieman, testified that Petitioner's "brain does not work in the same exact same way as it should for most others his age." *Id.* at *4. Dr. Zieman further testified that, if Petitioner had come to him in his clinical practice, he would have recommended "a guarantor or a conservator; somebody to help him navigate through the world because he just doesn't seem to understand the way—the way things work in relationship to the way he thinks." *Id.*

The State presented its own expert evidence, challenging whether Petitioner suffers from PTSD, bipolar disorder, schizophrenia, and asserting an antisocial personality disorder. *See id.*

Given such complex mental health issues, which will take time for the CHU to investigate, research, and consult with experts and Petitioner about—while simultaneously preparing to litigate other issues that may be appropriate for

Petitioner's federal habeas litigation—appointing the CHU as Petitioner's § 3599 counsel is appropriate.  *See* DSC Policy at 3.

**D.    An appointment at this time in this case will increase judicial efficiency**

In addition to being appropriate under DSC policy and the circumstances of this case, appointing the CHU as Petitioner's § 3599 counsel now, rather than during or after his state post-conviction proceedings, may increase judicial efficiency by reducing delays that have occurred in cases where the CHU was appointed later in the process and was obligated to seek additional time for filings in order to provide adequate representation to the petitioners.  In several cases, where the CHU was appointed later in the process, the CHU has had to seek extensions of time for amendments and other filings, often notwithstanding objections from the Attorney General, because our office had to scramble to catch up.  Appointing the CHU at this juncture will allow the CHU to begin work on Petitioner's case and will therefore result in more efficient habeas litigation.

**V.    Conclusion**

For the foregoing reasons, Petitioner respectfully respects that this Court appoint the CHU as his counsel under §3599.

Respectfully submitted,


/s/ Billy H. Nolas
Billy H. Nolas
Chief, Capital Habeas Unit
Sean T. Gunn
Assistant Federal Public Defender
Office of the Federal Public Defender
Northern District of Florida
227 N. Bronough St., Suite 4200
Tallahassee, FL 32301-1300
(850) 942-8818

## CERTIFICATE OF SERVICE

I certify that on July 31, 2017, I served this motion by electronic transmission

to Assistant Attorney General Melissa J. Roca at melissa.roca@myfloridalegal.com

and capapp@myfloridalegal.com.

/s/ Billy H. Nolas
Billy H. Nolas

# ATTACHMENT

Extracts from
**The Outline of the Defender Services Program Strategic Plan**[1]
**Mission, Goals, Strategies**

**Mission**.  The mission of the Defender Services program is to ensure that the right to counsel guaranteed by the Sixth Amendment, the Criminal Justice Act (18 U.S.C. § 3006A), and other congressional mandates is enforced on behalf of those who cannot afford to retain counsel and other necessary defense services.  By fulfilling its mission, the Defender Services program helps to (a) maintain public confidence in the nation's commitment to equal justice under law and (b) ensure the successful operation of the constitutionally-based adversary system of justice by which both federal criminal laws and federally guaranteed rights are enforced.

## Goals

**Goal 1:**  Timely provide assigned counsel services to all eligible persons.
**Goal 2:**  Provide appointed counsel services that are consistent with the best practices of the
legal profession.
**Goal 3:**  Provide cost-effective services.
**Goal 4:**  Protect the independence of the defense function performed by assigned counsel so that
the rights of individual defendants are safeguarded and enforced.

### Strategies:  Goal 1 (Timeliness)

**Strategy 1:**  Federal Defender Organizations (FDOs) should be established in all judicial districts (or combined districts), where feasible, to provide direct representation in CJA cases and serve as a resource to private defense counsel who provide representation in such cases.

**Strategy 2:**  Highly qualified, fairly compensated, and optimally sized panels of private attorneys should be created to furnish representation in those cases not assigned to a defender organization.  (*Same as Goal (G) 2, Strategy 2*)

**Strategy 3 (Federal Capital Trials):**  Have FDOs and, in districts without a federal defender organization, local resource counsel identify cases that are likely to lead to federal capital indictments to ensure timely appointment of counsel.

**Strategy 4 (Federal Capital Trials):**  Federal Death Penalty Resource Counsel (FDPRC) should timely provide advice and assistance to federal defenders and, in districts without a federal defender organization, the AOUSC, regarding appointment of counsel for persons facing a federal capital prosecution.

---

[1] Incorporates revisions approved by the Committee on Defender Services at its meeting in December 2012.

1

## Strategies:  Goal 1 (Timeliness)

> **Comment to Strategies 4 and 5:**  These strategies are intended to provide clients with the benefit of both a federal defender's knowledge of the local bar and district court, and the FDPRC's knowledge of the national capital bar's expertise and experience.  By statute or Judicial Conference policy, however, it is the head of the FDO who has the ultimate authority to decide which qualified counsel to recommend in a federal capital prosecution within his or her district.  If capital resource counsel (FDPRC) is contacted directly by the court before the court has contacted the defender, any recommendation of FDPRC should be made to the defender.

**Strategy 5 (Federal Capital Trials):**  Consistent with 18 U.S.C. § 3005 and Judicial Conference policy, federal defenders and, in districts without a federal defender organization, local resource counsel should notify FDPRC of potential or actual federal capital cases and consider their recommendations regarding the appointment of counsel.

**Strategy 6 (Federal Capital Trials):**  Consistent with 18 U.S.C. § 3005 and Judicial Conference policy, the federal defenders must be prepared to make their recommendations expeditiously.

**Strategy 7 (Federal Capital Trials):**  Consistent with 18 U.S.C. § 3005 and Judicial Conference policy, district courts shall consider the recommendation of defenders or, in the absence of a defender, the AOUSC (FDPRC), regarding appointment of all lawyers in a federal capital trial case.

**Strategy 8 (Capital Habeas Corpus):**  To promote the availability of counsel for timely appointment in capital habeas proceedings, make expert counsel available to provide appointed counsel with advice, assistance and training, and to assist the courts with recruitment of counsel.

**Strategy 9 (Capital Habeas Corpus):**  The procedural status of cases in which a death sentence has been imposed should be tracked and monitored.

**Strategy 10 (Capital Habeas Corpus):**  Encourage and promote district courts to contact and consider the recommendation of federal defenders and, in districts without a federal defender organization, local resource counsel regarding the appointment of counsel in capital habeas corpus cases.

> **Comment:**  This strategy is analogous to Goal 1, Strategy 7, applies to all federal capital habeas corpus cases (28 U.S.C. §§ 2254 and 2255), and is consistent with the policies of 18 U.S.C. § 3005 regarding capital prosecutions.  Federal defenders and local resource counsel are encouraged to contact courts in their district and promote this strategy by asking the court to solicit and consider their recommendations for appointment of capital habeas corpus counsel.

**Strategies:  Goal 1 (Timeliness)**

**Strategy 11 (Capital Habeas Corpus):**  Federal defenders and, in districts without a federal defender organization, local resource counsel, should notify capital habeas resource counsel of potential or actual federal capital habeas corpus cases and consider their recommendations regarding the appointment of counsel.

> **Comment:** This strategy is analogous to Goal 1, Strategy 5.  For federal capital habeas corpus cases resulting from state convictions, filed pursuant to 28 U.S.C. § 2254, federal defenders without capital habeas units (CHUs) and local resource counsel should consult with the national Habeas Assistance and Training Counsel Project (HAT) or regional capital habeas resource counsel.  Potential federal capital habeas corpus cases resulting from federal convictions, to be filed pursuant to 28 U.S.C. § 2255, are tracked by 2255 Project staff, who will contact federal defenders and local resource counsel to consult about the selection and appointment of counsel. When a federal defender or local resource counsel becomes aware of a case about which they have not been contacted by 2255 Project staff, the federal defender or local resource counsel should initiate contact with the 2255 Project.

**Strategy 12 (Capital Habeas Corpus):**  Federal courts should be encouraged to appoint counsel to represent state death-sentenced prisoners in federal capital habeas corpus cases (pursuant to 28 U.S.C. § 2254), and provide appropriate litigation resources, at the earliest possible time permissible by law; preferably, no later than the conclusion of the state direct appeal.  *(Same as G 2, Strategy 18)*

> **Comment:**  Conclusion of the state direct appeal means affirmance of the conviction and sentence by the highest state court of authority hearing the case, regardless of whether a petition for certiorari will be filed in the United States Supreme Court.  This strategy implicitly places a duty upon counsel who anticipate representing state death-sentenced prisoners in such cases to seek the federal appointments and appropriate litigation resources at the earliest time permissible by law.
>
> Federal counsel need adequate time to investigate, research, and prepare proper capital habeas corpus petitions.  Prior to even beginning work on the petition, federal counsel must collect and read the record, establish a relationship with the client, assemble a team that includes mitigation experts and fact investigators, and make preliminary evaluations regarding such matters as client competency, mental retardation, and mental health issues, as well as comply with the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases.  Because extra-record claims can not be raised as part of direct appeals, they must be fully investigated and litigated in habeas corpus petitions.
>
> Statutes of limitations place strict limits on the time counsel has to file such a petition.  Under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), the statute of limitations for filing a petition is one year.  Experience has shown that one year is barely sufficient time to file a federal capital habeas corpus petition even when the petitioner is represented by experienced, institutionally-funded, full-time, federal defender staff well versed in capital habeas litigation.  In practice, waiting to appoint federal counsel until the state post-conviction proceeding is completed results in less than one year in which to file the federal habeas petition.  The limitation period begins to run, subject to "tolling," from the latest of four triggering events, including "the date on which the judgment became final by the conclusion of direct review or the expiration of the time

3

for seeking such review" (i.e., a petition for writ of certiorari in the United States Supreme Court). 28 U.S.C. § 2244(d)(1). Although "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation" under the AEDPA (28 U.S.C. § 2244(d)(2)), all or any portion of the federal statute of limitations could expire before the state post-conviction petition is filed. State post-conviction counsel often expend nearly all of the federal limitations period before filing a state post-conviction pleading. This is especially true in states that have longer filing deadlines than those provided by the AEDPA.

In any state that is certified by the U.S. Attorney General for the "opt-in" provisions of Chapter 154 of title 28, U.S. Code, as well as states facing certification, an even more constricted time limitation for filing petitions applies. Counsel facing the shorter statute of limitations must file a capital habeas corpus petition in federal court "not later than 180 days after final State court affirmance of the conviction and sentence on direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2263(a). Among other restrictions, the 180 days is not tolled until a proper petition for writ of certiorari is filed in the Supreme Court. 28 U.S.C. § 2263(b)(1).

The United States Supreme Court has held that "[a]n attorney's assistance prior to the filing of a capital defendant's habeas corpus petition is crucial, because '[t]he complexity of our juris-prudence in this area ... makes it unlikely that capital defendants will be able to file successful petitions for collateral relief without the assistance of persons learned in the law.'" *McFarland v. Scott*, 512 U.S. 849, 855-56 (1994). "We therefore conclude that a 'post conviction proceeding' within the meaning of § 848(q)(4)(B) [recodified as 18 U.S.C. § 3599(a)(2)] is commenced by the filing of a death row defendant's motion requesting the appointment of counsel for his federal habeas corpus proceeding." *Id.* at 856-57. "[T]he right to counsel necessarily includes a right for that counsel meaningfully to research and present a defendant's habeas claims." *Id.* at 858. In sum, it is critical that counsel be appointed as early as possible in order to fulfill this mandate.

## Strategies: Goal 2 (Quality of Representation)

**Strategy 1:** Recruit and retain attorneys who are among the best in their field.

**Strategy 2:** Highly qualified, fairly compensated, and optimally sized panels of private attorneys should be created to furnish representation in those cases not assigned to a defender organization. (*Same as G 1, Strategy 2*)

**Strategy 3:** Secure sufficient funding for expert, investigative, and other support services so that federal defenders and CJA panel attorneys can provide their clients with support services that are commensurate with the highest standards of the profession.

4

**Strategies: Goal 2 (Quality of Representation)**

**Strategy 4:**  Have FDOs compensate attorneys and support staff commensurate with the compensation provided by United States Attorneys' Offices for similar work and years of experience; and have panel attorneys paid a fair, competitive rate sufficient to attract and retain qualified counsel.

**Strategy 5:**  Secure funding sufficient to provide Community Defender Organizations with employee benefits at levels comparable to those authorized for Federal Public Defender Organizations.

> **Comment:**  Achieving parity between FPDO and CDO employee benefits is necessary (1) for CDOs to recruit and retain highly-qualified employees and (2) to enable all FDO (CDO and FPDO) employees to be compensated at levels comparable to United States Attorney Office personnel. Thus, this strategy complements Goal 2, strategies 1 and 4, as they apply to CDOs.

**Strategy 6:**  Federal defenders and panel attorneys should meet in person with their clients to establish and to maintain the attorney-client relationship of trust and confidence necessary to provide quality representation.

> **Comment:**  Experience has shown that telephone contact and/or videoconferencing cannot substitute for face-to-face meetings with clients.  Discovery material, court pleadings, plea agreements, and presentence reports are examples of documents that are best reviewed with clients at in-person meetings.  There may be extraordinary circumstances where, presentencing, defense counsel determines that it is in the best interest of the client to communicate via telephone or videoconference.  Telephone and videoconferencing contacts should be rare and limited only to those circumstances where it would not diminish the quality of representation or adversely impact the attorney-client relationship.

**Strategy 7:**  Sponsor and fund training programs for FDO staff.

**Strategy 8:**  Defenders have an obligation, in consultation with the local panel attorney representative and other panel members, to assess the training needs of local panel attorneys and to provide them with training and other educational resources.

**Strategy 9:**  To improve the quality of representation, adequate funding should be obtained so that the Administrative Office, in coordination with the federal defenders, the Federal Judicial Center, the United States Sentencing Commission, bar associations, and local courts, can provide panel attorneys with the training needed to assure effective assistance of counsel to their clients.

**Strategy 10:**  Training and support should be provided to panel and FDO attorneys in the use of computer technology in litigation, e.g., in providing and receiving discovery and in the presentation of evidence or demonstrative aids in court.

**Strategies:  Goal 2 (Quality of Representation)**

**Strategy 11:**  The federal judiciary should continue to seek authority under the CJA and related statutes, including 18 U.S.C. § 3599(g)(1), to establish and modify dollar limitations on panel attorney and other compensation.

**Strategy 12:**  Courts should be encouraged to create a system that ensures that panel attorneys are compensated adequately and in a timely manner for work reasonably performed and discouraged from reducing fees to panel attorneys without just cause.

> **Comment:**  Courts should encourage CJA counsel to meet and confer with detained clients and ensure that panel attorneys are adequately compensated for travel time and expenses, including when clients are remotely detained.

**Strategy 13:**  The federal judiciary should continue its efforts to obtain sufficient funding to permit compensation rates to be adjusted up to the maximum amount authorized by law.

**Strategy 14 (Capital Habeas Corpus):**  For institutional defender organizations providing capital post-conviction representation, establish a peer review process for identifying approaches to addressing issues they face.

**Strategy 15 (Capital Habeas Corpus):**  Through collaborative efforts of the state and federal governments, promote systems which would result in early appointment of counsel who are available to provide continuous representation throughout state and federal collateral proceedings in capital cases.  Such counsel should be qualified, and have sufficient funding and resources. (*Same as G 3, Strategy 5*)

> **Comment:**  Timely appointment means no later than the conclusion of the state direct appeal; conclusion of the state direct appeal means affirmance of the conviction and sentence by the highest state court of authority hearing the case, regardless of whether a petition for certiorari will be filed in the United States Supreme Court.  Ordinarily, CJA funds should not be used for state proceedings.

**Strategy 16 (Capital Representations):**  In their representation of clients in federal capital cases, appointed counsel should (1) comply with the February 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (Guidelines 1.1 and 10.2 et seq.), and the 2008 Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases,[2] and (2) consult regularly with death penalty resource counsel (FDPRC, HAT, Federal Capital Appellate Resource Counsel, or 2255 Project, depending on the type of proceeding).

---

[2] *See* www.law.hofstra.edu/DeathPenalty or
www.abanet.org/deathpenalty/resources/docs/2008_July_CC1_Guidelines.pdf

6

**Comment to Strategies 16 and 17:** This strategy applies to all federal death-eligible prosecutions, appeals, and capital habeas corpus cases (28 U.S.C. § 2254 and § 2255). The United States Supreme Court has recognized the ABA death penalty guidelines as "standards for capital defense work," citing them as "well-defined norms." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003). Subsequent decisions cite the Commentary as well as the black-letter guidelines. *Florida v. Nixon*, 543 U.S. 175, 191 (2004); *Rompilla v. Beard*, 545 U.S. 374, 387 (2005). Judicial Conference policy indicates that "[i]n all federal death penalty cases, defense counsel should obtain the services of Federal Death Penalty Resource Counsel in order to obtain the benefit of model pleadings and other information that will save time, conserve resources and enhance representation. The judiciary should allocate resources sufficient to permit the full value of these services to be provided in every case." See Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation (Spencer Report), recommendations adopted by the Judicial Conference on September 15, 1998.

Counsel appointed in federal capital prosecutions should consult regularly with Federal Death Penalty Resource Counsel (FDPRC); counsel appointed in federal capital appeals should consult regularly with Federal Capital Appellate Resource Counsel; counsel appointed in capital cases pursuant to 28 U.S.C. § 2255 should consult with the 2255 Project; and counsel, other than federal defenders in capital habeas units, appointed in capital cases pursuant to 28 U.S.C. § 2254, should consult with the Habeas Assistance and Training Counsel Project (HAT).

## Strategies: Goal 2 (Quality of Representation)

**Strategy 17 (Capital Representations):** Prior to recommending counsel for appointment in a federal capital case, federal defenders or local resource counsel should advise potential counsel that anyone appointed is expected to (1) comply with the February 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (Guidelines 1.1 and 10.2 et seq.), and the 2008 Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, and (2) consult regularly with death penalty resource counsel (FDPRC, Federal Capital Appellate Resource Counsel, HAT, or 2255 Project, depending on the type of proceeding).

**Comment:** See Goal 2, Strategy 16.

**Strategy 18 (Capital Habeas Corpus):** Federal courts should be encouraged to appoint counsel to represent state death-sentenced prisoners in federal capital habeas corpus cases (pursuant to 28 U.S.C. § 2254), and provide appropriate litigation resources, at the earliest possible time permissible by law; preferably, no later than the conclusion of the state direct appeal. *(Same as G 1, Strategy 12)*

## Strategies: Goal 3 (Cost Effectiveness)

**Strategy 1:** Have FDOs compensate attorneys and support staff commensurate with the compensation provided by United States Attorneys' Offices for similar work and years of experience; and have panel attorneys paid a fair, competitive rate sufficient to attract and retain qualified counsel. (*Same as G 2, Strategy 4*)

**Strategy 2:** Encourage FDOs to employ a process for reviewing written requests for outside experts to ensure that no unnecessary or unnecessarily expensive services are acquired.

**Strategy 3:** Ensure that federal defenders and panel attorneys are providing quality representation to their CJA clients by meeting the resource and other challenges of complex cases involving voluminous and/or electronic material in a cost-effective manner.

**Strategy 4:** Collect data to determine whether and how changes in the law or changes in prosecutorial, judicial, or law enforcement practices impact program costs.

**Strategy 5 (Capital Habeas Corpus):** Through collaborative efforts of the state and federal governments, promote systems which would result in early appointment of counsel who are available to provide continuous representation throughout state and federal collateral proceedings in capital cases. Such counsel should be qualified, and have sufficient funding and resources. (*Same as G 2, Strategy 15*)

> **Comment:** Timely appointment means no later than the conclusion of the state direct appeal; conclusion of the state direct appeal means affirmance of the conviction and sentence by the highest state court of authority hearing the case, regardless of whether a petition for certiorari will be filed in the United States Supreme Court. Ordinarily, CJA funds should not be used for state proceedings.

**Strategy 6:** Encourage judges to use case budgeting in qualifying CJA panel attorney cases, in accordance with Judicial Conference policies, to provide cost-effective representation that promotes and is consistent with the best practices of the legal profession.

> **Comment:** The CJA Guidelines encourage budgeting in all CJA panel attorney capital representations and, where appropriate, in non-capital panel attorney representations with the potential for extraordinary cost. See CJA Guidelines §§ 230.26 and 640.

## Strategies:  Goal 4 (Independence of the Defense Function)

**Strategy 1:**  Promote adequate funding for the CJA program by Congress and the judiciary.

**Strategy 2:**  In addition to whatever advocacy is undertaken by the judiciary, ensure that federal defenders and panel attorneys, in coordination with the Administrative Office's Financial Liaison and Analysis Office, have meaningful access to congressional appropriations committee staff, to educate them about the Defender Services program and discuss its requirements.

**Strategy 3:**  Promote adequate compensation for assigned counsel and, in individual cases, ensure assigned counsel's ability to obtain the necessary resources for the provision of expert, investigative and other services in a manner that does not unreasonably compromise or interfere with the exercise of sound independent professional judgment.

**Strategy 4:**  Ensure that federal public and community defenders have independence in (1) the case assignment function, (2) the allocation of office resources, and (3) the supervision of office staff.

**Strategies:  Goal 4 (Independence of the Defense Function)**

**Strategy 5:**  Ensure that the appointment and/or reappointment processes for federal public and community defenders are fair and structured so as to promote the independence of the defense function.

**Strategy 6:**  Promote having budgetary and administrative oversight of federal defender offices performed in such a way that it does not unreasonably impact the needs of individual clients, taking into account variations in local practices.

**Strategy 7:**  Ensure (1) that a fair process is in place in district and appellate courts for appointment to, and removal of attorneys from, the CJA panel and (2) that the process for assigning cases to panel attorneys is fair and promotes the assignment of cases to lawyers qualified to handle the cases they are assigned.

**Strategy 8:**  Ensure the confidentiality of records created and preserved for the strategic planning data collection process in a manner consistent with caselaw, to the extent possible, on the production of records of retained counsel, standards of professional responsibility, and statutory or other provisions governing the production of comparable records by other government attorneys.